(C.D. 2384)

JOHN V. CARR & SONS, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 13, 1963)

*John C. Ray* for the plaintiff.

*John W. Douglas*, Acting Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The Chrysler Corporation of Detroit, Mich., purchased from Metal Powders, Inc., of Iberville, Quebec, Canada, certain merchandise described on the special customs invoice as "SPONGE IRON POWDER MP.52."

The importation was returned for duty at the rate of 19 per centum ad valorem as an article in chief value of iron, provided for in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108.

It is the claim of plaintiff that the commodity should be classified as granular or sponge iron in paragraph 301 of said act (19 U.S.C. § 1001, par. 301), as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, and by the Torquay protocol to said general agreement, 86 Treas. Dec. 121, T.D. 52739, and subjected to duty at the rate of 62½ cents per ton, plus 35 cents per pound on the molybdenum content in excess of 0.2 per centum.

The competing provisions of the statutes involved herein are as follows:

Paragraph 397 of the Tariff Act of 1930, as modified, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:

    \*        \*        \*        \*        \*        \*        \*

    Typewriter spools \* \* \*

    \*        \*        \*        \*        \*        \*        \*

Carriages, drays, * * *

*　　　*　　　*　　　*　　　*　　　*　　　*

Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum * * * _____ 19% ad val.

Paragraph 301 of said act, as modified by the Annecy protocol, *supra:*

Granular or sponge iron_____ 62½¢ per ton

Paragraph 301 of said act, as modified by the Torquay protocol, *supra:*

The additional duty under the third proviso to paragraph 301, Tariff Act of 1930, on molybdenum in excess of 0.2% contained in articles provided for in said paragraph shall be_____ 35¢ per lb.

At the trial, three witnesses testified on behalf of the plaintiff and one for the defendant. Nine exhibits were received in evidence and will be referred to wherever necessary in the course of this opinion.

Plaintiff's witness, Donald Harvey, testified in substance as follows: He is a technical sales representative for Metal Powders, Inc., which company manufactured and exported the subject merchandise; had been employed with that company 5 years; traveled extensively in the United States and Canada, selling to and servicing customers who use sponge iron powder. Prior to his connection with the Canadian company, he had, for 7 years, been in the employ of Powder Metallurgy, Ltd., in London, England, where he was likewise a technical sales representative with the English company which produced metal powders. Harvey's early education in England covered the subjects of physics, chemistry, and basic metallurgy. As a member of the Powder Metallurgy Institute, he had contributed an article to a Canadian technical magazine discussing the manufacture and use of sponge iron powders. Harvey produced a sample, representing the sponge iron powder in controversy, which was received in evidence as plaintiff's exhibit 1. He stated that it was manufactured "by breaking up, or granulating sponge iron cake, or lump, * * *. It is also screened." The commodity is used by the consumer by feeding it into a die or mold and subjecting it to compression. Upon ejection of the parts from the press, they are passed through a sintering furnace under temperature controls where the particles are fused together. The merchandise is known as sponge iron powder, MP 52; there are many other types of sponge iron powder; it acquires the name sponge iron powder because of its characteristic porosity. The particles of the powder have minute holes which cause them to appear spongy in nature. It is the porosity of sponge iron powder which distinguishes it from iron sand or iron grit. The latter are solid particles and, because of their nature, are used for abrasive purposes, shot blasting, and sandblasting—purposes for which sponge iron powder is not adapted.

Harvey gave the following as a typical chemical analysis of the commodity—

* * * carbon, 0.05%; manganese, 0.40%; molybdenum, 0.75%; nickel, 0.35%; phosphorus, 0.04%; silicon, 0.25%; sulfur, 0.05%; loss in weight in hydrogen, 0.90%; balance, iron.

The variations in the types of sponge iron powder are due mainly to the type of raw materials from which the sponge iron powder is produced; there are variations in the physical contents used and different processes or different methods of production, which result in variations in the final product.

On cross-examination, Harvey testified that, in the manufacture of a product like exhibit 1, scrap steel is reduced to a molten condition and molybdenum and nickel are added; it is then sintered into a cake and, subsequently, granulated into the form in which it was imported. The addition of molybdenum and nickel improves the physical properties of sponge iron used in the production of engineering parts for automobiles.

Plaintiff's second witness, John H. Speck, testified in substance as follows: For 25 years, he had been chief metallurgist of the Amplex Division of the Chrysler Corp., and was shown to have ample educational qualifications for his profession; that his duties were—

* * * to approve or reject samples of powder that represent production shipments; to approve parts that are made in the plant; to examine them for physical and chemical characteristics; and to correspond with the vendors, and other companies, with regard to the powders and other parts that are made there.

and that Amplex produces articles made from metal powders. Speck identified exhibit 1 as granular sponge iron powder, which was imported by his company. It is used mixed with other ingredients, such as copper, graphite, and zinc stearate, then screened and fed into production machines and otherwise treated to prepare it for further use; that exhibit 8 represented part No. SM 6360, consisting of metallic rings, approximately 1¼ inches in diameter, the "shiny" ones being called briquets, which is simply an article pressed from the powder mixture above described. The dull-finished rings are described as briquets after they have been sintered; that is, passed through a furnace at a temperature of 2,050 degrees.

Speck described sponge iron powder as a powder which, under high-power magnification, gives the appearance of the porosity of a sponge, being built up of minute particles to create a granular spongy powder. He pointed out that iron grit and iron shot, because of their very hard substance, are used for shot blasting to remove burs and other imperfections and otherwise improve surface characteristics in casting-machine articles, purposes for which sponge iron is not suitable.

On cross-examination, Speck testified that the addition of molybdenum and nickel, for instance, in the production of sponge iron powder, did not destroy the purpose and use of sponge iron powder, but that those materials were added for the purpose of creating or producing a harder product.

Roy E. Blue, the third witness for the plaintiff, testified that he had been with the Chrysler Corp. since 1929 in the powder metallurgy laboratory of the Amplex Division and, for the last 6 years, chief engineer in that department. He was shown to be well qualified to testify on the subject of powder metallurgy and was, in fact, supervisor of the work of the previous witness, Speck, and his testimony would be essentially the same as that of the witness Speck.

Defendant's witness, William L. Batten, testified that he is a practicing metallurgical engineer for the Vanadium-Alloys Steel Co. of Latrobe, Pa.; is manager of the powder metallurgy department and has been actively engaged in the metallurgical profession for the last 15 years. He testified to his familiarity with the sale of various iron powders, steel powders, alloyed steel, and also with a powder, known as sponge iron powder, which latter he described as—

* * * a commercial designation of sponge iron powder * * * essentially, a pure iron powder, with a spongy shape * * *

which might contain vanadium, partially in the form of oxide, nickel, molybdenum, and, possibly, other metallic elements.

Batten testified that the sponge iron powder that he is familiar with—

* * * begins as an iron ore, and essentially a selected iron ore for its purity; is mixed with coke and limestone, and heated below the melting point, to produce a product called sponge iron. This sponge iron product then can be used for melting, as a substitute for cast iron, or it can be further ground down, screened, annealed, and sold as iron powder, known as sponge iron powder.

When asked to explain the difference between sponge iron and iron powder, Batten stated—

Well, the sponge iron is the conglomerated reduced iron ore that is in cake or lump form after the reduction. This sponge iron must then be ground, or reduced, or annealed, rather, and screened to size, to become sponge iron powder.

In his opinion, the addition of fractional percentages of nickel or molybdenum in the above process alters the physical characteristics of the iron.

On cross-examination, Batten testified that his company did not manufacture sponge iron powder. He designated the imported product, represented by exhibit 1, as an alloy iron powder, or an alloy steel. In answer to a question from the court, Batten stated that the iron content required by a product which is named sponge iron powder would range from—

96½% or 97½%, on up to about 98½%, or 99%.

In the case at bar, the percentage of iron is approximately 98 per centum.

Batten defined an alloy powder as "* * * an alloy, or combination of two or more metals in granular form," which would include exhibit 1. He stated that sponge iron powder would have approximately 98 per centum iron, 1 per centum iron oxide, 0.03 per centum carbon, 0.02 per centum nickel, 0.002 per centum molybdenum, and 0.15 per centum vanadium oxide, with traces of other material, the percentage of iron being about the same as in the case at bar.

Plaintiff's witness, Harvey, recalled, flatly contradicted Batten, who had testified that exhibit 1 was an alloy powder, Harvey contending that an alloy powder is a powder in which "* * * the particles are all of the same alloy as the mass of the material. * * * To put it another way, if you could separate one particle of a true alloy powder, you would find that the analysis of that one particle was the same as the analysis of 100 pounds of that material," a condition which does not exist in exhibit 1. Consequently, Harvey was clearly of the opinion that exhibit 1 could not be an alloy. In other words, sponge iron powder is a mixture in which the various elements retain their identity, as distinguished from an alloy in which the different particles migrate within one another, creating a uniform mixture.

The provision for granular or sponge iron first appeared in paragraph 301 of the Tariff Act of 1930, along with several materials, such as iron in pigs, iron kentledge, spiegeleisen, scrap iron, scrap steel, hammer scale, roll scale, and mill scale, which from their description are obviously crude materials of a kind intended to be used in the manufacture of articles of metal.

There appears to be no litigation in which the courts have clearly defined the scope and meaning of the term "granular or sponge iron." Our attention has been invited by plaintiff to the case of *Mantle Lamp Co. of America* v. *United States*, 71 Treas. Dec. 651, T.D. 48927, wherein it appears that certain merchandise, invoiced as powdered iron and entered as iron sand, had been classified as an article, not specially provided for, in chief value of iron, and was claimed, *inter alia*, to be properly classifiable as granular or sponge iron. There was testimony in the case that the merchandise was composed of 97.05 per centum iron, with a small amount of impurities; that it was formed of grains or grits; that it was granular iron; and that it "could be called grit of iron." There was also testimony that the merchandise, after importation, was used in combination with other materials to manufacture small, cylindrical pellets, which were employed in the radio industry.

In the course of its opinion, the court stated—

* * * according to the uncontradicted testimony of three highly qualified experts, the imported merchandise is essentially iron in the form of fine grains consisting of minute hard particles, and that it is granular iron.

We, therefore, hold as a matter of law that the involved merchandise is granular iron within the meaning of said paragraph 301.

After making the observation that—

> \* \* \* according to the same expert testimony and from an examination of the sample, the merchandise in question is in the form of grains or grits and has the appearance of very fine sand. This fact, combined with the circumstance that the chemical analysis shows it to be composed almost entirely of powdered iron, makes paragraph 335 also applicable, the provision in that paragraph being for "Grit, shot, and sand of iron or steel."

the court concluded—

> Upon the record we therefore hold as a matter of law that the merchandise herein is grit or sand of iron within the meaning of said paragraph 335.

This latter conclusion was apparently based upon an earlier decision in *Georgia Marble Co.* v. *United States*, 63 Treas. Dec. 1576, Abstract 24356, wherein, upon an inadequate record, the court had held that merchandise consisting "of ordinary cast iron reduced to powder form, probably used as an abrasive material," was dutiable within the provision for "grit, shot, and sand of iron or steel, in any form" in paragraph 335 of the Tariff Act of 1930.

Since the court, in the *Mantle Lamp* case, was of the opinion that the commodity there in controversy was equally described as granular iron, within the meaning of paragraph 301, and as grit, shot, or sand of iron in paragraph 335, resort to paragraph 1559, which required the application of the provision carrying the higher rate of duty, resulted in classifying the commodity as sand of iron.

The weight of competent evidence in the record before us establishes to our satisfaction that the merchandise in controversy is not grit, shot, or sand of iron. Those are articles which, by reason of their hard structure, are principally used as abrasives, whereas the imported product is so manufactured as to have a porous structure and, for that reason, is not adapted to abrasive uses. However, the presence of nickel and molybdenum in the commodity results in producing a substance which is commercially used as a hardening additive in the production of automotive parts.

The suggestion that the merchandise in this case is an alloy is, we believe, without merit.

Webster's New International Dictionary, second edition, unabridged (1953), defines an alloy as—

> alloy, *n*. \* \* \* 2. A substance composed of two or more metals intimately mixed and united, usually by being fused together and dissolving in each other when molten \* \* \*.

Note, also, *United States* v. *C. J. Tower & Sons*, 40 CCPA 14, C.A.D. 491, wherein the court quoted with apparent approval the definition given by one of the witnesses, as follows:

> An alloy, as we used it in manufacturing, was considered to be an intimate and uniform mixture of two or more metals or metals and non-metals prepared

under very rigid specifications in order to impart certain desired properties to the metal.

The record amply establishes that the commodity now before us does not possess the qualities set forth in those definitions.

It is significant that paragraph 301, which is relied upon by plaintiff, provides for the imposition of additional duty on molybdenum in excess of 0.2 per centum contained in articles provided for in that paragraph.

Molybdenum is an element which gives strength and vitality to sponge iron, thereby adding to its usefulness in the fabrication of engineering parts.

Since the meaning of the phrase "granular or sponge iron" is somewhat obscure, we find some light on the subject by reference to Summaries of Tariff Information, volume 3, part 1, page 10 (1948), from which we quote the following:

Granular or sponge iron (ordinarily called sponge iron) is metallic iron ranging from about 95 to 98.5 percent in purity. It is a granular, porous material low in deleterious impurities.

Granular or sponge iron is made by heating finely divided iron ore, carefully selected steel mill scale, or other ferrous materials, in the presence of carbon to temperatures far below the melting point of iron. The carbon—which may be supplied either by coal, coke, or gaseous fuel—combines with the oxygen of the ferrous material, leaving relatively pure iron as a residue. The use of steel mill scale as a source of sponge iron has been increasing, and a high-grade sponge iron can be produced from scale.

One of the more important uses of sponge iron is in the form of briquets (to avoid oxidation of the porous material) in the electric steel furnace for making very high-grade steels. Selected scrap, muck bars, or high-grade pig iron are also used for the same purpose. Sponge iron in powdered form, as well as iron powder produced by other methods, is also used for the production, by powder metallurgy, of magnetic cores and small machine parts. In general, powdered metal articles are used to best advantage under conditions which do not require high tensile strength. A third use of sponge iron is as a precipitant for copper and zinc from solutions; ordinary scrap iron or steel is probably equally effective and usually much cheaper.

The production of sponge iron in the United States has been largely experimental in the past and still is to an important degree. * * *

Imported sponge iron, nearly all from Sweden, first appeared on the United States market in the middle 1920's. In subsequent years imports have ranged from a few hundred tons to nearly 2,000 tons annually except during World War II when they virtually ceased * * *.

We deem the suggestion of the defendant that the term "sponge iron" is limited to the cake form of the product before it is ground into iron powder as untenable. Under the *Smillie* rule, a dutiable provision which names an article without terms of limitation includes all forms of the article, in the absence of a contrary legislative intent. *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, T.D. 38966.

Upon the record before us and for the reasons stated, we find and

hold that the weight of competent evidence establishes that the subject merchandise is properly classifiable in paragraph 301, *supra*, as granulated or sponge iron and subject to the cumulative duty therein provided, as claimed by plaintiff.

To the extent indicated, the protest herein is sustained, and judgment will issue directing the collector to reliquidate the entry accordingly.