(C.D. 2423)

C. F. REED  
W. A. GLEESON } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 11, 1963)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.  
*John W. Douglas*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Protest 61/18042, in the name of C. F. Reed, and protest 61/13755, in the name of W. A. Gleeson, were consolidated for the purpose of trial.

Reed and Gleeson are customhouse brokers who acted as agents for Nat Harrison & Associates of Machias, Maine, the real parties in interest.

The merchandise in controversy was produced by the Quebec Iron & Titanium Corp. of Sorel, Quebec, Canada, and was shipped to the United States by the Houston Aggregate Company of Canada, Ltd.

The importations are described on the entry papers as "Granulated iron" or "Granulated Pig Iron as Granular or Sponge Iron." The collector of customs classified the commodity as grit, sand, and shot of iron or steel in paragraph 335 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 335), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and duty was imposed thereon at the rate of $\frac{5}{8}$ of a cent per pound.

Plaintiffs, by their protests, claim that the merchandise should be classified as granular iron, which is provided for in paragraph 301 of said act (19 U.S.C. § 1001, par. 301), as modified by the Annecy protocol to said general agreement, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, and dutiable at the rate of $62\frac{1}{2}$ cents per ton.

At the trial, plaintiffs moved to amend their protests "* * * to claim alternatively that the merchandise is dutiable under paragraph 5 as a chemical element or compound, or combination thereof, at $10\frac{1}{2}$ percent ad valorem, or at 5 percent ad valorem under paragraph 1558, as unmanufactured articles not enumerated or provided for" and the motion was granted. Although the alternative claims are not abandoned, it is clear from the brief filed on behalf of plaintiffs that they rely upon the claim for classification in paragraph 301.

The pertinent text of the statutes above cited is here set forth.

Paragraph 335 of the Tariff Act of 1930, as modified, *supra:*

Grit, shot, and sand of iron or steel, in any form_____ $\frac{5}{8}$¢ per lb.

Paragraph 301 of said act, as modified, *supra:*

Granular or sponge iron_____ $62\frac{1}{2}$¢ per ton

Paragraph 5 of said act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108:

All chemical elements, all chemical salts and compounds, * * * and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, * * *__ $10\frac{1}{2}$% ad val.

Paragraph 1558 of said act, as modified by the General Agreement on Tariffs and Trade, *supra:*

All raw or unmanufactured articles not enumerated or provided for * * *_____ 5% ad val.

Three witnesses testified herein, one for the plaintiffs and two for the defendant.

The following plaintiffs' exhibits were introduced in evidence:

Exhibit 1, collective exhibit 2, and exhibit 3—samples representing the subject merchandise.

Collective exhibit 4—two laboratory reports.

Illustrative exhibit 5—sample of steel shot.

Collective illustrative exhibit 6—sample of angular grit.

Illustrative exhibit 7—specifications for sizing grit and shot prepared by the Society of Automotive Engineers.

Exhibit 8—photograph illustrating a poor quality of iron shot.

Plaintiffs' witness, Norman Hampden Cuke, testified in substance as follows:

In 1941, he graduated from McGill University, Montreal, Canada, as a metallurgical engineer. After a year with the Defense Industries, Ltd., in Montreal, Canada, he spent 4 years as an aeronautical engineer in the Royal Canadian Air Force; then, for 5 years, he was employed by the Canadian Liquid Air Co. which was engaged in the oxygen and industrial gas business in Canada. During that time, he traveled extensively throughout Canada observing the steel and cast-iron foundries. His travels also extended throughout the steel industry in the United States. At the time of his testimony, he was sales manager for the Quebec Iron & Titanium Corp., with which he has been associated for 11 years. During the first 5 years, he was employed in production on its large electric treatment furnaces and became general supervisor of that operation. Since then, he has conducted sales operations that brought him in contact with dealers throughout the United States and Canada selling titanium slag and iron. He testified to his familiarity with the importation in controversy, was involved in its production and with the sale of it.

Cuke described the process by which the subject merchandise is produced substantially as follows: Iron ore, as it comes from the mines, "is beneficiated to a slight extent in a wet separation process"; it is then charged into large electric furnaces to which is added anthracite coal. The presence of the coal results in reducing the iron oxide to relatively pure iron. In this process, complete reduction is not desired and only a sufficient amount of coal is added to partially reduce the iron in order to allow the titanium to stay in the slag. This permits a separation of two liquid materials, titanium slag, containing about 70 percent titanium oxide ($TiO_2$), and iron, containing about 2 to 2½ percent carbon, with traces of sulphur, phosphorus, silicon, and manganese.

After the molten iron comes from the furnaces, it is subjected to a water granulation process. In this process, molten iron is poured down a trough into a large concrete water tank. Before it hits the water tank, it passes through a horizontal, high pressure water spray which breaks the molten iron into "small droplets or pieces" represented by exhibits 1, 2, and 3. The size of the imported product ranges from one-quarter of an inch down to powder dust. In the

water granulation process, no effort is made to control the size of the particles.

Cuke stated that the imported commodity was used in making heavyweight concrete counterweights for the large scanning units in the construction of a United States Navy radar tower at Machias, Maine.

The witness explained that iron grit and shot are produced under much more highly controlled conditions than those in the production of granular iron. He produced a sample of shot, size S–330 (plaintiffs' illustrative exhibit 5), explaining that shot, as sold, is divided into narrow dimensional ranges for diameters and S–330 "is one of the ranges."

The witness also testified to the chemical and metallurgical differences between granular iron and iron or steel shot. To quote the witness—

* * * Our iron is essentially pure iron with about 2 to 2½ percent carbon and no other elements such as silicon. * * *

In the production of shot, however, about 1 percent silicon is definitely required. The imported product is extremely brittle, whereas shot or grit must possess a degree of toughness or hardness not possessed by the subject merchandise, which, being brittle, would easily break up if it were attempted to use it as an abrasive shot or grit.

The witness also produced samples of angular grit (plaintiffs' collective illustrative exhibit 6) which differ from the imported commodity in much the same particulars as the iron shot. He explained that the term "sand of iron or steel" has gone out of common use. He identified illustrative exhibit 7 as containing sizing specifications for shot and grit, prepared by the Society of Automotive Engineers (S.A.E.); that while grit and shot are made according to specifications, chemically and structurally, such specifications would not apply to the production of the imported commodity "The users, and therefore the shot manufacturers, the users demand a shot that is very uniform in size and shape, and hence these size specifications." It also appears that grit and shot are usually packaged in cans or bags for shipment, whereas the imported commodity is shipped in bulk, in open gondola cars, and is much less expensive than grit and shot.

Bidermann T. DuPont testified for the defendant substantially as follows:

Since 1933, he had been manager of the iron powder operations of the Glidden Co. in Johnstown, Pa.; his company is engaged primarily in the production of a number of grades of iron powder; and he was familiar with merchandise known as granulated iron. Having heard the testimony of the witness Cuke to the effect that the company which

shipped the imported material called it granulated iron, he said, "I would not contend this was an inaccurate description," adding, however, that he "* * * would also believe in a broad general sense you can call this iron shot, or shot of iron."

Upon being shown collective exhibit 2, consisting of samples of the imported merchandise, and after the analysis of the merchandise (collective exhibit 4) was read to the witness, he was asked whether he could state what the merchandise is, to which he replied, "I think so in a general way * * *" "I would call this either a granulated or shotted iron." When asked to explain what shot of iron or shotted iron is, the witness replied, "I would have to answer that question this way: In the general metal-working industry, I believe that shotted iron denotes material of iron, an iron base material that is in the form of spheroids or globules, generally used for the purpose of abrasive applications. In a broad sense, shotted iron, to me, denotes any particle of iron that is in globular or spherical form."

By examining exhibit 2, he found a percentage of globular or spherical particles. When asked if the method of producing collective exhibit 2, as described by the previous witness, would be called by him a shotting process, he replied, "Yes, in a broad sense." When asked if he could identify the merchandise represented by exhibit 3, another sample of the imported commodity, DuPont replied, "I would have to, if called upon to make a brief designation for it, I would say that it was a granulated or shotted iron compound."

The witness also examined illustrative exhibit 1, another sample representative of the imported commodity, and stated, "This appears to be another form of shotted or granulated iron, and it is characterized by a substantial portion of globular or spherical type of particles."

When asked by the court if sponge iron and granulated iron are the same, the witness replied:

* * * This is a difficult question. Sponge iron, in its basic sense, is a material that was produced in a massive form for melting purposes in chunks or large sections; by breaking up these chunks or massive pieces of sponge iron, it is possible to make what amounts to sponge iron particles. Under the dictionary definition of granular material, you would, I think, be safe in saying this sponge iron powder could also be called granular powder, but I would not contend that all sponge iron powder, that all granular powder was sponge iron powder.

The witness further stated—

* * * By the accepted definition as published by the A.S.M., American Society for Metals, the term "granular powder" is an equidimensional particle of non-spherical structure.

Defendant's second witness, Peter Schmey, testified that, for the past 5 years, he had been employed as chief metallurgist by the Easton Metal Co. of Easton, Pa., which is engaged in the production of iron powder. Prior to becoming chief metallurgist, Schmey had, for 9

years, been an assistant metallurgist. Based upon his experience as a powder metallurgist and his knowledge of iron foundry products and having examined exhibit 2, together with the analysis (collective exhibit 4), he was asked if he could identify it and replied, "I would call it iron shot" and that "* * * in a broad sense it falls under the classification of shot." The witness further stated that the basic reason for calling the merchandise shot was "The globular, spherical-like shape of the particles."

Schmey agreed that iron shot and grit are not suitable for powder metallurgy; that the chemistry of shot and grit used for abrasive purposes is an important consideration; and, furthermore, that they must have the qualities and properties required by the S.A.E. specifications.

When shown exhibit 5, which is a sample of sized shot, Schmey stated that it differed from the materials in exhibits 1, 2, and 3 in that exhibit 5 had been screened for size which would have an important bearing upon its ultimate use.

With respect to the claim for classification of the merchandise in issue in paragraph 301 of the tariff act, as modified, as granular or sponge iron, the evidence fails to sustain that claim.

In the case of *John V. Carr & Son, Inc.* v. *United States*, 50 Cust. Ct. 29, C.D. 2384, this court was called upon to construe and apply the provision for granular or sponge iron which appeared for the first time in paragraph 301 of the Tariff Act of 1930. In the course of deciding that the sponge iron powder there in issue was encompassed by the claimed provision, this court made the following statement:

Since the meaning of the phrase "granular or sponge iron" is somewhat obscure, we find some light on the subject by reference to Summaries of Tariff Information, volume 3, part 1, page 10 (1948), from which we quote the following:

Granular or sponge iron (ordinarily called sponge iron) is metallic iron ranging from about 95 to 98.5 percent in purity. It is a granular, *porous* material low in deleterious impurities.

Granular or sponge iron is made by heating finely divided iron ore, carefully selected steel mill scale, or other ferrous materials, in the presence of carbon to temperatures far below the melting point of iron. The carbon—which may be supplied either by coal, coke, or gaseous fuel—combines with the oxygen of the ferrous material, leaving relatively pure iron as a residue. The use of steel mill scale as a source of sponge iron has been increasing, and a high-grade sponge iron can be produced from scale. [Italics added.]

*        *        *        *        *        *        *

There is no evidence whatsoever in the record before us that the instant merchandise possesses the characteristic of porosity typical of merchandise known as granular or sponge iron. In the absence of such a showing, plaintiffs' claim for classification within the purview of paragraph 301 of the tariff act, as modified, must be overruled.

The record evidence upon which the case has been submitted is conflicting and very unsatisfactory. An examination of it fails to show that any of the witnesses had been manufacturers or traders in iron grit, shot, or sand, which greatly weakens the probative value of their testimony on this phase of the case.

Plaintiffs' witness Cuke stated that this was his first experience in a commercial way with merchandise such as that in controversy; neither had he had any experience in the production of, or dealing in, iron shot.

Defendant's witnesses DuPont and Schmey were both engaged in the production of iron powder, but neither of them was familiar with the manufacture of, or dealing in, iron shot, although DuPont testified that in a previous employment his concern had utilized iron shot as an abrasive in cleaning iron castings. Each of the three witnesses was giving his expert opinion regarding the classification of the subject merchandise based upon his general knowledge as a metallurgist. The testimony, although conflicting, weighs in favor of the collector's classification.

In view of the conclusion we have reached, it is unnecessary for us to consider the alternative claims pursuant to paragraph 5 and paragraph 1558 of the tariff act, as modified.

It is a basic principle of interpretation that the collector of customs, in classifying merchandise, has found all the facts necessary to support his decision, which is presumed to be correct. *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, C.A.D. 735.

Upon a careful review of the record, we are of the opinion that the evidence is insufficient to overcome the correctness of the decision of the collector of customs. Therefore, the protests are overruled on all grounds.

Judgment will be entered accordingly.